United States District Court
Southern District of Texas

**ENTERED**

March 31, 2022

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| **RUSTY GRAHAM,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 6:20-CV-00033** |
| | § | |
| **CITY OF PORT LAVACA, TEXAS,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rusty Graham filed a lawsuit against the City of Port Lavaca, Texas (the "City"), raising claims of discrimination based on his sexual orientation. The City filed a Motion for Summary Judgment. (Dkt. No. 20). Graham filed a Response, (Dkt. No. 29), to which the City replied, (Dkt. No. 30). For the following reasons, the Court **GRANTS** the City's Motion.

**I.     BACKGROUND**

Graham was employed as a police officer by the Port Lavaca Police Department (the "Department"). On March 23, 2018, while he was working for the Department, Graham was confronted by Chief of Police Colin Rangnow. Lieutenant Eric Salles had discovered that Graham did not to conduct a background check on Jesse Villareal before Villareal participated with Graham in the Department's ride-along program. (Dkt. No. 29-2 at 6); (Dkt. No. 20-2 at 2–3). Chief Rangnow showed Graham a photograph of Villareal and asked Graham who was in the picture. (Dkt. No. 29-2 at 5). Graham claims he told Chief Rangnow that Villareal was his boyfriend, thus disclosing his sexual

orientation to Chief Rangnow for the first time.  (*Id.*).  The City claims that Graham told

Chief Rangnow that Villareal was his friend, and that neither Chief Rangnow nor

Lieutenant Salles was aware of Graham's sexual orientation until after Graham left the

Department.  (Dkt. No. 20-1 at 4–5); (Dkt. No. 20-2 at 6).

Graham claims that the Department's tone toward him "abruptly changed" after

this event.  (Dkt. No. 29 at 2).  Graham says he was treated differently, issued disciplinary

actions, not selected for an open detective position, and effectively terminated in May

2018—all because of his sexual orientation.  (Dkt. No. 29-2 at 7–10).  The City maintains

that Graham's sexual orientation had nothing to do with these actions.  It claims that

Graham was not selected for the detective position because the top-performing candidate

during the detailed interview process was unanimously selected by the supervisory

group.  (Dkt. No. 20 at ¶¶ 16–17).  The City also claims that Graham was made to resign

in lieu of termination because of his past disciplinary actions, mainly, that he was caught

submitting false time sheets and claiming more overtime than he was working.  (*Id.* at

¶¶ 19–22).

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "A material fact is one that might affect the outcome of the suit under governing

law," and "a fact issue is genuine if the evidence is such that a reasonable jury could

return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d

605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial

responsibility of informing the district court of the basis for its motion," and identifying

the record evidence "which it believes demonstrate[s] the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d

265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary

judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air

Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

   If the movant meets this burden, the nonmovant must then come forward with

specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d

538 (1986).  The nonmovant must "go beyond the pleadings and by [the nonmovant's]

own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs,

LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (citations omitted).  "If the

evidence is merely colorable, or is not significantly probative," summary judgment is

appropriate.  *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019)

(citation omitted).  The nonmovant's burden "will not be satisfied by 'some metaphysical

doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions,

or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th

Cir. 2005) (quoting *Little*, 37 F.3d at 1075).  But the district court must view the evidence

in the light most favorable to the nonmovant.  *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d

528, 533 (5th Cir. 1997).

## III.    DISCUSSION

Title VII makes it unlawful for an employer to discharge or discriminate against

any individual because of the individual's race, color, religion, sex, or national origin.  42

U.S.C. § 2000e-2(a)(1).  "Sex" as it is used in Title VII includes discrimination based on an

individual's sexual orientation.  *Bostock v. Clayton County*, ____ U.S. ____, 140 S.Ct. 1731,

207 L.Ed.2d 218 (2020).    Graham raises three claims under Title VII: employment

discrimination, retaliation, and hostile work environment.[1]  (Dkt. No. 9 at 4–6).

### A.       EMPLOYMENT DISCRIMINATION

Graham contends that the City discriminated against him on the basis of his sexual

orientation.[2]   His employment discrimination claim under Title VII is based on two

actions by the City: (1) hiring another person for the position of detective and (2) forcing

him to resign in lieu of termination.  (Dkt. No. 9 at 3–4).  The City claims it had legitimate,

nondiscriminatory reasons for both.  (Dkt. No. 20 at ¶¶ 16–22).  In response, Graham

contends that the City's reasons are pretexts for its actual discriminatory motive.  (Dkt.

No. 29 at 10–18).

---

[1]    Graham also brings his claims of employment discrimination, retaliation, and hostile work environment under the Texas Commission on Human Rights Act (TCHRA), codified at Chapter 21 of the Texas Labor Code.  (Dkt. No. 9 at 4–6).  The law governing Title VII and TCHRA claims is identical.  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999). Because Graham's TCHRA claims parallel his Title VII claims and the governing law is identical, the Court analyzes the claims together and refers only to Title VII.  *See id.*

[2]    In his Complaint, Graham also claims the City discriminated against him for being male. (Dkt. No. 9 at 4–5).  But in his Response, Graham does not argue that he was discriminated against on this basis; instead, he only argues that he was discriminated against based on his sexual orientation.  *See* (Dkt. No. 29).  Thus, the Court finds that Graham has abandoned this claim.  *See Matter of Dall. Roadster, Ltd.*, 846 F.3d 112, 126 (5th Cir. 2017) (holding that a plaintiff abandoned claims that were not argued in his opposition to a motion for summary judgment); *Vela v. City of Houston*, 276 F.3d 659, 679 (5th Cir. 2001).

1.      *McDonnell Douglas* **Framework**

Because Graham relies solely on circumstantial evidence for his Title VII discrimination claim, the familiar *McDonnell Douglas* framework applies. *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 316–17 (5th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).  Under *McDonnell Douglas*, a plaintiff must make out a *prima facie* case of discrimination. *Jones v. Gulf Coast Rest. Grp., Inc.,* 8 F.4th 363, 368 (5th Cir. 2021).  The City "does not contest that [Graham] has sufficiently stated a *prima facie* case under Title VII."  (Dkt. No. 20 at ¶ 15).

Once a *prima facie* case of discrimination has been established, "the burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action." *Jones*, 8 F.4th at 368.  "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (per curiam).  The City claims that Graham was not selected for the detective position because he was outperformed by another candidate during the interview process. (Dkt. No. 20 at ¶¶ 16–17).  The City also claims that Graham was made to resign in lieu of termination because of his past disciplinary actions, mainly, that he falsified his time sheets.  (*Id.* at ¶ 19–22).  Graham does not argue that the City's reasons are insufficient to meet its burden of production.  *See* (Dkt. No. 29).

Once the employer meets its burden of production, "the burden then shifts back to the plaintiff to show that the reason is a pretext." *Jones*, 8 F.4th at 368.  "Pretext may be established through evidence of disparate treatment or by showing the employer's explanation to be false or unworthy of credence—that it is not the real reason for the

adverse employment action." *Id.* (internal quotations omitted). But "the plaintiff must produce '*substantial* evidence' of pretext." *Id.* at 369 (emphasis added) (internal quotations omitted). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021) (citation omitted). "Once a Title VII case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). In answering this question, a court should consider "the probative value of the proof that the employer's explanation is false and any evidence that supports the employer's case." *Jones*, 8 F.4th at 369 (cleaned up). Accordingly, the Court examines the City's evidence that it had nondiscriminatory reasons for its actions and Graham's evidence that the City's reasons are pretextual.

### 1.    The City's Evidence of Nondiscriminatory Reasons

Graham first claims that he was not selected for the detective position despite being more qualified than Alyssa Chapa, who was ultimately chosen. (Dkt. No. 9 at 3). The City contends that Graham was not selected for the detective position because, after all the candidates completed the detailed three-step interview process to fill the position, Chapa was unanimously selected by the supervisory group. (Dkt. No. 20 at ¶¶ 2, 17–18). In support of its position, the City provides Chief Rangnow's affidavit, in which he describes the three-step process, including an oral interview evaluation, a written exam, and an "in-depth discussion" among the Department supervisors about each candidate's

performance.  (Dkt. No. 20-1 at 1).  The interview portion was conducted by the City

Manager and four members of the community and was the only scored portion of the

process.  (*Id.* at 1–2).  On the interview portion, Graham ranked fourth out of the six

candidates.  (*Id.* at 2).  But the oral interviews were only one part of the interview process,

as demonstrated by the fact that the candidate who received the highest score on that

portion was not selected.  (*Id.*).  Affidavits from Lieutenant Salles, Detective Kenneth Pyle,

and Lieutenant Javier Ramos—who were all members of the supervisory group

overseeing the selection process—corroborate Chief Rangnow's account.  (Dkt. No. 20-2);

(Dkt. No. 20-3); (Dkt. No. 20-4).  Detective Pyle denies ever telling Graham that he

outperformed the other applicants, (Dkt. No. 20-3 at 2).

The second basis for Graham's Title VII claim is that he was forced to resign or be

terminated and charged with a third-degree felony.  (*Id.* at 4).  The City contends that

Graham's resignation in lieu of termination was necessary in part because of Graham's

past violations of the Department's ride-along policy and failure to respond to dangerous

situations but was primarily based on the fact that Graham was caught submitting false

time sheets claiming more overtime than he was working.  (Dkt. No. 20 at ¶¶ 3–4, 19–22).

On the first point, Chief Rangnow and Lieutenant Salles both testified in their

affidavits that background checks were required for ride-along participants and that

Graham violated Department policy when he failed to conduct one for Villareal.  (Dkt.

No. 20-1 at 3); (Dkt. No. 20-2 at 2–3).  Both affidavits also state that when Lieutenant Salles

conducted Villareal's background check himself, it revealed that Villareal had been

arrested three times.  (Dkt. No. 20-1 at 3); (Dkt. No. 20-2 at 3).

On the second point, Lieutenant Salles also details discipline against Graham for reporting errors and for failing to respond to an incident involving a suicidal person and four firearms, even though he was available. (Dkt. No. 20-2 at 3–4). This also played a role in the adverse employment actions at issue in this case.

Finally, Chief Rangnow and Lieutenant Salles state that other officers reported Graham for falsifying his time sheets. (Dkt. No. 20-1 at 4); (Dkt. No. 20-2 at 4). These other officers purportedly stated that Graham said he had "flex hours off" whenever he left early. (Dkt. No. 20-1 at 4); (Dkt. No. 20-2 at 4, 8). Based on these reports, Chief Rangnow and Lieutenant Salles compared Graham's time sheets to Department video footage of Graham's arrival and departure times. (Dkt. No. 20-1 at 4); (Dkt. No. 20-2 at 4). After this investigation, Lieutenant Salles sent a memorandum (including copies of Graham's time sheets) to Chief Rangnow detailing significant discrepancies between Graham's reported time and the video evidence of when Graham arrived and departed on specific dates. (Dkt. No. 20-2 at 8–14). The memorandum states that Graham reported a total of just over 26 extra hours worked. (*Id.* at 9). The memorandum also notes that Graham was seen leaving the station in a personal vehicle. (*Id.* at 9–10). Based on the results of the investigation, Chief Rangnow and Lieutenant Salles confronted Graham, who purportedly admitted that his "prepopulating" of time sheets was "a big issue" and that he was "neglectful." (Dkt. No. 20-1 at 4); (Dkt. No. 20-2 at 5).

The City also provides evidence that its actions were not based on Graham's sexual orientation. In his affidavit, Chief Rangnow flatly rejects Graham's contention that Graham ever disclosed his sexual orientation. Chief Rangnow claims that when he

showed Graham a picture of Villareal, Graham said that Villareal was his "friend."  (Dkt.

No. 20-1 at 4).   Chief Rangnow and Lieutenant Salles both state that it was not until

Graham filed his EEOC charge that they learned Graham is homosexual.  (*Id.* at 5); (Dkt.

No. 20-2 at 6).   Chief Rangnow and Lieutenant Salles's affidavits also demonstrate that

the Department had already started looking into Graham's failure to conduct a

background check on Villareal before Chief Rangnow showed Graham the picture of

Villareal—the time at which Graham claims he first disclosed his sexual identity to Chief

Rangnow.  (Dkt. No. 20-1 at 3–4); (Dkt. No. 20-2 at 2–3).

## 2.      Graham's Evidence of Pretext

Bearing the burden of showing the City's reasons for its actions are pretextual,

Graham makes three arguments.  First, Graham argues that he was treated differently

after disclosing his sexual orientation to Chief Rangnow.  Second, Graham argues that

other officers—who are not homosexual—also failed to conduct background checks on

ride-along participants and had errors on their time sheets but were not terminated or

asked to resign.  Third, the day Graham was effectively terminated was only 55 days after

he disclosed his sexual orientation.

Graham first attempts to demonstrate that the City's explanation is false or

unworthy of credence.  *See Jones*, 8 F.4th at 368.  Graham claims that he made Chief

Rangnow aware of his sexual orientation on March 23, 2018, when Chief Rangnow

showed Graham a picture of Villareal and Graham told Chief Rangnow that Villareal was

his boyfriend.  (Dkt. No. 29 at 1–2); (Dkt. No. 29-2 at 5).  In so doing, Graham points to

his own affidavit as well as deposition testimony from Chief Rangnow showing that

Graham's initial experience and interactions within the Department were positive, his performance reviews were positive, and he had received promotions and pay increases. (Dkt. No. 29-2 at 2–5); (Dkt. No. 29-5 at 8–10). But after he disclosed his sexual orientation to Chief Rangnow, Graham contends that the "tone abruptly changed." (Dkt. No. 29 at 2). In his affidavit, Graham claims that he was issued three disciplinary actions, the first of which came the same day he disclosed his sexual orientation to Chief Rangnow. (Dkt. No. 29-2 at 8). He further claims that Chief Rangnow and Lieutenant Salles began treating him differently, avoiding him, and no longer inviting him to coffee briefings. (*Id.* at 7–8). It was also after Graham disclosed his sexual orientation to Chief Rangnow that he was asked to resign in lieu of termination. (*Id.* at 10).

Graham next attempts to establish pretext "through evidence of disparate treatment." *See Jones*, 8 F.4th at 368. In his affidavit, Graham claims that Department policy did not actually require background checks for ride-along passengers and that other officers who brought people on ride-alongs without conducting background checks were not disciplined.[3] (Dkt. No. 29-2 at 6–7). With respect to falsifying time sheets and claiming overtime that he did not work, Graham claims that he regularly arrived early for his shift and was often on call after leaving the station, and that Chief Rangnow and Lieutenant Salles knew this. (*Id.* at 9). Graham states that other officers, including Sergeant Justin Klare, did the same thing and were never reprimanded. (*Id.*). Finally, Graham names Brandon Carl, who Graham describes as a "very ineffective and

---

[3]    The other officers Graham names are Alyssa Chapa, Justin Klare, and Andrew Dimas. (Dkt. No. 29-2 at 6).

inadequate" police officer, as another Department employee who was given opportunities to correct his performance and was not fired. (*Id.* at 11). Graham argues that he was treated differently from Carl because of his sexual orientation. (*Id.*).

Graham's final argument showing that the City's reasons are pretextual is the close temporal proximity between disclosing his sexual orientation to Chief Rangnow on March 23, 2018, and his resignation in lieu of termination on May 17, 2018—55 days later. (Dkt. No. 29 at 14–15). This argument is an additional attempt to show that the City's explanation is false or unworthy of credence. *See Jones*, 8 F.4th at 368. He claims that the less-than-two-month period between disclosing his sexual orientation and his forced resignation supports the inference that he was terminated based on his sexual orientation. (Dkt. No. 29 at 14–15).

### 3.      Pretext Analysis

The Court now determines whether Graham has met his burden of producing "substantial evidence" of pretext. *Jones*, 8 F.4th at 369. In making this determination and deciding whether summary judgment is warranted, the Court must consider the "quality and weight of the evidence," including "the probative value of the proof that the [City's] explanation is false and any evidence that supports the [City's] case." *Id.* (cleaned up). The Court finds that Graham has failed to meet his burden.

Initially, Graham's affidavit is entitled to little weight. The Court is obligated to consider the "quality and weight of the evidence," and Graham's affidavit is merely a "refutation of the employer's legitimate nondiscriminatory reason[s]," which the Fifth

Circuit has held is insufficient summary judgment evidence of pretext.[4]  *Id.* (citation

omitted).  Graham's remaining evidence is deposition testimony from Chief Rangnow

positively reviewing Graham's initial performance and the 55-day period between

Graham's disclosure of his sexual orientation and his resignation in lieu of termination.[5]

This is highly speculative evidence that the City's nondiscriminatory reasons were false

or unworthy of credence.  *See Shackelford*, 190 F.3d at 406 ("Due to the excessively

speculative nature of the aforementioned evidence of discrimination, we affirm summary

judgment[.]").

Along with Graham's evidence, the Court must also consider the City's evidence

supporting its nondiscriminatory rationales.  *Jones*, 8 F.4th at 369.  The City provides

declarations from four members of the supervisory group that oversaw the interview

process for the detective position, stating that Graham was not selected after the

supervisory group unanimously selected another candidate because she performed the

best during the three-step interview process.  (Dkt. No. 20-1); (Dkt. No. 20-2); (Dkt. No.

---

[4]    The City also provides evidence that Graham's affidavit may include perjurious statements.  (Dkt. No. 30 at ¶ 1).  This further undermines the affidavit's "quality and weight." *See Jones*, 8 F.4th at 369.

[5]    In his Response, Graham also frequently cites the entire depositions of Lieutenant Salles, Chief Rangnow, and himself.  (Dkt. No. 29 at 11–18) (citing "*Exhibits A–E*").  These depositions amount to over 300 pages of testimony.  (Dkt. No. 29-3); (Dkt. No. 29-4); (Dkt. No. 29-5).  In cases where Graham has directed the Court to specific portions of the deposition testimony, the Court has reviewed and considered those portions as part of its analysis.  As for Graham's repeated citations to all three full depositions, "[i]f somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).  It is not the Court's task to read all of the depositions and speculate about which parts Graham suggests would support his theories.

20-3); (Dkt. No. 20-4). The City also provides the results of an investigation based on video and time sheet evidence that Graham falsified his time sheets, overreporting over 26 hours. (Dkt. No. 20-2).

Graham's evidence, alongside the City's evidence, is insufficient to demonstrate "a conflict in substantial evidence to create a jury question regarding discrimination." *See Shackelford*, 190 F.3d at 404. Graham cannot meet his burden to show pretext "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." *See Harville v. City of Houston*, 945 F.3d 870, 876–77 (5th Cir. 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)). Graham has not provided "substantial evidence" of pretext because his evidence is not "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."[6] *See Watkins*, 997 F.3d at 283 (citation omitted). Accordingly, the Court grants summary judgment in favor of the City on Graham's Title VII discrimination claim.

---

[6]    It remains unclear whether Graham actually disclosed his sexual identity to Chief Rangnow. *Compare* (Dkt. No. 20-1 at 4) *with* (Dkt. No. 29-2 at 5). Regardless, Graham has not carried his burden of showing that the City's reasons for its actions were pretextual. *See Wallace v. Methodist Hosp. System*, 271 F.3d 212, 220 (5th Cir. 2001) ("The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates."). Graham has not carried his burden of showing that the City's reason for selecting someone else for the detective position (that he was outperformed) and its primary reason for effectively terminating him (that he falsified his time sheets) were pretextual.

### B.     RETALIATION

Graham also brings a Title VII retaliation claim against the City.  (Dkt. No. 9 at 5–6).  Like employment discrimination claims, Title VII retaliation claims are subject to the *McDonnell Douglas* framework, which first requires that the plaintiff to establish a *prima facie* case.  *Jones*, 8 F.4th at 368.  A *prima facie* case of retaliation under Title VII requires that (1) the plaintiff engage in activity protected by Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment decision.  *Shackelford*, 190 F.3d at 407–08.

Graham's retaliation claim is based on the same events that gave rise to his employment discrimination claim—he contends that he was not selected for the detective position and forced to resign in lieu of termination because of his sexual orientation.  (Dkt. No. 29 at 17–18).  But, as the City correctly asserts, Graham fails to make out a *prima facie* case of retaliation under Title VII because he did not engage in a protected activity.  (Dkt. No. 20 at ¶ 25).  "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."  *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted); 42 U.S.C. § 2000e-3(a).  Graham's only basis for his retaliation claim is that the City took adverse action against him because of his sexual orientation—Graham does not even allege, let alone provide evidence showing, that he engaged in an activity protected by Title VII.  As another district court accurately explained, "[b]eing a member of a protected class is not a 'protected activity' for the purpose of a retaliation claim under Title VII[.]"  *Kamara v. Adams & Assocs., Inc.*,

14

No. 2:16-cv-02300-TLN-KJN, 2018 WL 4904821, at *3 (E.D. Cal. Oct. 9, 2018).   Adverse

employment action based on being a member of a protected class supports claims for

discrimination, not retaliation.  *See id.* ("Plaintiff's allegations . . . based on her status as a

racial minority, or because of her membership in a protected class, assert claims for

discrimination.").   Accordingly, the Court finds that the City is entitled to judgment as a

matter of law on Graham's retaliation claim because he failed to establish a *prima facie*

case.

Even assuming Graham had made out a *prima facie* case of retaliation, the Court

finds that, as discussed above, Graham cannot establish that the legitimate

nondiscriminatory reasons offered by the City for the adverse employment actions were

a pretext for retaliation.   Accordingly, the Court grants summary judgment in favor of

the City on Graham's Title VII retaliation claim for this reason as well.

## C.   HOSTILE WORK ENVIRONMENT

Finally, Graham raises a hostile work environment claim.   (Dkt. No. 9 at 5).   A

hostile work environment claim requires that Graham show (1) he is a member of a

protected class; (2) he was subject to unwelcome harassment; (3) the harassment was

based on his status as a member of a protected class; (4) the harassment affected a term,

condition, or privilege of employment; and (5) the employer knew or should have known

of the harassment in question and failed to take prompt remedial action.   *Hernandez v.*

*Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).   Expounding on the fourth factor,

the Fifth Circuit has stated that harassment affects a term, condition, or privilege of

employment "if it is sufficiently severe or pervasive to alter the conditions of the victim's

15

employment and create an abusive working environment." *Id.* at 651 (internal quotations

omitted).  The Court should consider "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work

performance." *Id.* (citation omitted).

Graham claims he was treated differently and harshly by others at the

Department, ignored, received angry glares, and was no longer invited to the morning

coffee briefings in Chief Rangnow's office.  (Dkt. No. 29 at 8).  Specifically, he claims that

Chief Rangnow and Lieutenant Salles distanced themselves from Graham after he

disclosed his sexual orientation.  (*Id.*).  In support of these claims, Graham cites only his

own affidavit.  (*Id.*).  The City concedes that Graham is a member of a protected class, but

contends that is "as far as he gets[.]"  (Dkt. No. 20 at ¶ 24).  The City argues that Graham

has not provided evidence of a harassing event, that any harassment was based on his

sexual orientation, that any harassment was sufficiently severe or pervasive, or that the

City knew or should have known about the harassment and failed to take prompt

remedial action.  (*Id.*).

Graham's hostile work environment claim fails as a matter of law.  First, Graham's

self-serving, conclusory statements in his affidavit are insufficient summary judgment

evidence.  *See Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020).  But

even considering the allegations in Graham's affidavit, he has not provided evidence

sufficient to support his claim.  Graham describes being passed over for the detective

position, certain disciplinary actions, and his forced resignation.  (Dkt. No. 29-2 at 8).  As

16

discussed above, Graham has failed to demonstrate that the City's nondiscriminatory reasons for these actions were pretextual.  Additionally, Graham's affidavit states that he was no longer invited to coffee briefings after disclosing his sexual orientation, as well as generally stating that Chief Rangnow and Lieutenant Salles avoided him and became "distant."  (*Id.* at 7–8).  Even if this conduct constituted harassment under a hostile work environment theory, it does not come close to being sufficiently severe or pervasive to create an abusive working environment.  Nor has Graham shown that it was because of his sexual orientation.  *See Hernandez*, 670 F.3d at 651; *Vital v. Nat'l Oilwell Varco*, 4:12-CV-1357, 2014 WL 4983485, at *42 (S.D. Tex. Sept. 30, 2014) ("'Silent treatment' and dirty looks, standing alone, do not create a hostile work environment.").  This is not "the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy [his] opportunity to succeed in the workplace."  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009). Because Graham has provided insufficient evidence to support his hostile work environment claim, the Court grants summary judgment in favor of the City.

## IV.    CONCLUSION

The Court **GRANTS** the City of Port Lavaca's Motion for Summary Judgment. Graham's claims are **DISMISSED WITH PREJUDICE**.

It is SO ORDERED.

Signed on March 31, 2022.

_____

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**